UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X
                                                     :
MR. AND MRS. N.C., on behalf of their son M.C.,      :
                                                     :
                    Plaintiffs,                      :        04 Civ. 6173 (SCR)
                                                     :
            -against-                                :        **MEMORANDUM DECISION**
                                                     :        **AND ORDER**
BEDFORD CENTRAL SCHOOL DISTRICT,                     :
                                                     :
                    Defendant.                       :
————————————————————————X

STEPHEN C. ROBINSON, U.S. District Judge:

I.      **Background**

        A.      **Procedural History**

        On August 10, 2004, Mr. and Mrs. N.C. (the "Plaintiffs") filed this lawsuit, on behalf of

their son M.C., against the Bedford Central School District (the "Defendant") pursuant to the

Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400, et seq.  The

original Complaint seeks review of an April 2004 determination by New York State Department

of Education State Review Officer Paul F. Kelly (the "SRO") affirming the February 2004

decision of Impartial Hearing Officer George Kandilakis ("IHO Kandilakis") which held that

M.C. was not a student with a disability under the IDEA for the 2003-2004 time period because

he did not meet the requirements for being emotionally disturbed.  Plaintiffs, who unilaterally

placed M.C. into an alternative school environment beginning in April 2003, also seek a ruling

that this alternative placement was appropriate and that Plaintiffs are therefore entitled to

reimbursement under the IDEA for part of the 2002-2003 school year and all of the 2003-2004

school year.  Both parties submitted motions in support of their positions.

While this Court was considering those motions, Plaintiffs requested a pre-motion conference so that they could seek this Court's leave to file a Supplemental Complaint. At a conference held on October 13, 2006, this Court granted leave to file the Supplemental Complaint as part of the original action. Plaintiffs' Supplemental Complaint seeks review of a February 2006 determination by the SRO[1] affirming the November 2005 decision of Impartial Hearing Officer Edward Luban ("IHO Luban") which held that M.C. was not a student with a disability under the IDEA for the 2004-2005 school year because he did not meet the requirements for being emotionally disturbed. Plaintiffs, who continued their unilateral placement of M.C. through the 2004-2005 school year, also seek a ruling that this alternative placement was appropriate and that Plaintiffs are therefore entitled to reimbursement under the IDEA for the 2004-2005 school year. Both parties submitted motions in support of their positions on December 13, 2006. This Court will address Plaintiffs' motions for the 2003-2004 time period and the 2004-2005 school year in a single opinion, as the two issues involve virtually identical factual and legal issues. For the reasons discussed below, this Court finds in favor of the Defendant with regard to both academic years at issue.


**B.     IDEA**

Congress enacted the IDEA to promote the education of children with disabilities. See, e.g., Schaffer v. Weast, 126 S. Ct. 528, 531 (2005). Under the IDEA, a school district must provide each student with a disability with "special education and related services." 20 U.S.C. § 1401(9). Parents "may present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). The parents involved in

---

[1] Paul F. Kelly, the SRO who made the April 2004 determination, also issued the February 2006 decision.

such a complaint "shall have an opportunity for an impartial due process hearing." 20 U.S.C. §

1415(f).  In New York, such hearings are conducted before an IHO who is appointed by the

local board of education.  See N.Y. Educ. L. § 4404(1).  The IHO's decision may be appealed to

an SRO,  see N.Y. Educ. L. § 4404(2), and the SRO's decision may be challenged in either state

or federal court.  See 20 U.S.C. § 1415(i)(2)(A).


### C.    Facts

Beginning in 1999-2000, when M.C. was in seventh grade, Mrs. N.C.'s male cousin

began a course of sexual misconduct with M.C. that included, but was not limited to, watching

pornographic videos with M.C. and urging M.C. to engage in sexual intercourse with a female

while the cousin watched.  See N.C. ex rel M.C. v. Bedford Cent. Sch. Dist., 348 F. Supp. 2d 32,

35 (S.D.N.Y. 2004) (describing underlying facts); Dist. Ex. 22 at 4-5.[2]  In May 2000, Plaintiffs

obtained an Order of Protection against the cousin, but the cousin continued to contact M.C.

without Plaintiffs' knowledge.  2004 IHO Tr. at 399-404.  By 2001-2002, when M.C. was in

ninth grade, the cousin's conduct had escalated to sodomy.[3]  2004 IHO Tr. 759-60, 812-15; Dist.

Ex. 22 at 5.  In addition to these experiences, M.C. was diagnosed with Attention Deficit

Hyperactivity Disorder and phonemic processing deficits at the age of 15, and beginning in April

2002, M.C. began receiving certain accommodations for his learning disabilities under § 504 of

the Rehabilitation Act.  See Par. Ex. A; Dist. Ex. 12 at 2, Dist. Ex. 22 at 4.

---

[2] References to "Dist. Ex." and "Par. Ex." in this paragraph and in sub-section C(i) are to the exhibit numbers in the 2004 proceeding before IHO Kandilakis that began on October 28, 2003.

[3] In April 2002, the cousin was identified through an Internet sting operation, and was ultimately sentenced to a term of two to six years in state prison in June 2003.  N.C. ex rel M.C, 348 F. Supp. 2d at 35.

### i.       2003-2004 school year

M.C. started the 2002-2003 school year as a tenth-grade student at Fox Lane High School ("Fox Lane") in the Bedford Central School District.  In or about September or October 2002, M.C. began seeing Scott Gillet, a psychotherapist, on a weekly basis, and met with him for six months.  Dist. Ex. 11 at 1; Dist. Ex. 25 at 2; 2004 IHO Tr. at 824.  For several months, starting approximately in January 2003, M.C. was also under the care of a psychiatrist, Dr. Elon Schwartz, who prescribed anti-depressant and anti-psychotic medications for M.C.  See Dist. Ex. 11 at 1; 2004 IHO Tr. at 826-28.  In December 2002, M.C. was suspended from school for fighting; he was suspended again in January 2003 for an assault on a student, and again in March 2003 for possession of marijuana and drug paraphernalia.[4]  See Par. Ex. M at 1, 6; Dist. Ex. 32 at 1-3.  Shortly after the second suspension, on March 10, 2003, Plaintiffs referred M.C. to Defendant's Committee on Special Education (the "CSE") and sought to have him classified as emotionally disturbed, which would have qualified him for educational services under the IDEA; a CSE meeting was scheduled for May 22, 2003.  See Dist. Exs. 3, 9.

As part of the CSE referral process, M.C. underwent an educational evaluation on April 3, 2003 that consisted of diagnostic tests in reading, mathematics, and written language.  M.C. was rated as average or above average on all components of the reading and mathematics examinations, and was rated average or above average on six of the seven sections of the writing skills examination.  In addition, the examiner concluded that M.C. "showed progress in patience, cooperation and attitude throughout the testing period," while also recommending that M.C. "should still focus on improving behavior."  Dist. Ex. 10.

---

[4] M.C. was arrested pursuant to the second and third suspensions – once for assault, and once for drug possession.  See Dist. Ex. 22 at 4.

School Psychologist Dr. Jeffrey Shein conducted a psychological evaluation of M.C. on March 26, 2003, and issued a report on April 5, 2003.  The final report was based on the results of verbal and written tests, materials completed by Plaintiffs, and an interview with M.C. Among other things, Shein concluded that M.C.'s responses to certain questions placed him at the "upper limit of the moderate range of depression," but that other indicators "failed to reach the cut-off score for clinical depression."  Dist. Ex. 11 at 4.  M.C. self-reported more problems than are typically reported by boys aged 11 to 18, particularly with regard to "attention problems, rule-breaking behavior, and problems of an aggressive nature."  Id. at 5.  Mrs. N.C.'s ratings of her son on one particular screening instrument met or exceeded the threshold scores for a range of disorders, and Mrs. N.C. also reported that M.C. had talked about killing himself.  Id. at 6; 2004 IHO Tr. at 259-60.  Shein later testified that M.C.'s mood was not depressed during the evaluation, and that he did not see any signs of irritability.  2004 IHO Tr. at 733-35.

School Social Worker Dr. William Reulbach submitted a social history report concerning M.C. on April 10, 2003, in which he referenced M.C.'s "extremely traumatic history beginning when he was twelve years old."  Dist. Ex. 12 at 2.  According to Reulbach, M.C.'s "acting out and oppositional behavior escalated during tenth grade" and "he continued to medicate his depression with pot."  Id.; see also Dist. Ex. 22 at 3-4 (updated Social History report).

M.C.'s ninth grade report card indicates final average grades in his six courses of 89, 86, 83, 83, 80, and 76, for an overall average of 84.17; M.C. was on the honor roll for three quarters in ninth grade.  See Dist. Ex. 14A, 14B; 2004 IHO Tr. at 187.  In tenth grade, in the final marking period before he left Fox Lane, M.C. received grades in his four classes of 84, 81, 78, and 75, though M.C.'s overall average grade in the first marking period was 71.25 and in the

second marking period was 70.75.[5]   Though he was enrolled in fewer courses, M.C.'s scores in tenth grade ultimately were similar to his scores in ninth grade.  See Dist. Ex. 14A, 14B.

On April 15, 2003, prior to the CSE hearing, Plaintiffs made the unilateral decision to place M.C. in the Family Foundation School ("Family Foundation"), a restrictive boarding school targeted at "students who have suffered from any form of arrested development or problem behavior."  Dist. Ex. 15; Joint Ex. 1 at 7; see 2004 IHO Tr. at 174-75, 614-15. One of the central pedagogical principles of Family Foundation is that it employs "methods derived from the 12-step self-help program of Alcoholics Anonymous."  Id.  Family Foundation has not been approved by the New York State Education Department for special education.  See 2004 IHO Tr. at 173, 444.

At the CSE session on May 22, 2003, one of M.C.'s ninth grade teachers described him as "one of the best students" in ninth grade, but noted that M.C. exhibited increased difficulty with homework completion, tests, and attending class in tenth grade.  See Dist. Ex. 16 at 2. Reulbach reported at the meeting that M.C. began to share "traumatic history" toward the end of his ninth grade year year, and that M.C.'s drug-related issues significantly increased in the fall of sophomore year.  Id. at 2-3.  Nevertheless, the CSE determined that M.C. did not meet the criteria to be classified as a student with a disability – specifically, M.C. was not eligible for a classification of "student with an emotional disturbance" for the purposes of the IDEA, and was therefore ineligible for services pursuant to the statute.[6]  Id. at 3; see 2004 IHO Tr. at 185-87.  In response to the CSE's findings, Plaintiffs filed a request for an impartial hearing to challenge the CSE decision.  See Dist. Ex. 17.

---

[5] A fifth class – Culinary Arts – is listed on M.C.'s tenth grade transcript, but no grades are reported for this class.  It is not clear whether Culinary Arts was part of M.C.'s tenth grade course load.

[6] The CSE also found that M.C. was not a student with a "learning disability" or "other health impairment" within the meaning of the IDEA.  The instant motion, however, focuses exclusively on the decision not to classify M.C. as emotionally disturbed.

A pre-hearing conference was held before IHO Kandilakis on June 24, 2003, and the parties agreed to defer the impartial hearing so that the CSE could consider additional information, including medical reports prepared by Gillet and Schwartz, a classroom observation of M.C. at Family Foundation, and specific evidence of the sexual abuse, none of which was presented at the May 22, 2003 meeting.  See 2004 IHO Tr. at 45; Dist. Ex. 26.  A second CSE meeting was scheduled for July 31, 2003.

At the July 31, 2003 CSE meeting, the CSE reviewed additional documentation including an updated social history, Dist. Ex. 22, the classroom observation, Dist. Ex. 23, and letters from Schwartz and Gillet, Dist. Exs. 24, 25.  See 2004 IHO Tr. at 159.  The revised social history, completed by Reulbach on July 15, 2003, described M.C. as "well liked by both students and teachers and recognized by all as a leader."  Dist. Ex. 22 at 4; 2004 IHO Tr. at 195, 197-98.  Reulbach did, however, note teacher reports of disruptive behavior, inattentiveness, lack of self-control, and other misbehavior throughout M.C.'s middle school years, including a suspension from the eighth grade graduation dance because of conflict with school authority figures.  Dist. Ex. 22 at 2-3; Dist. Ex. 32 at 7-9.  This report also described the close counseling relationship between Reulbach and M.C., and the basic facts of the sexual abuse suffered by M.C.  Id. at 4-5.  Reulbach further discussed how M.C.'s behavior deteriorated at home after M.C.'s abusive interactions with his cousin.  Id. at 6.  M.C. told Reulbach that he was smoking pot during school in late fall 2002, and Reulbach speculated based on information from other students that that M.C. might be involved in more extensive drug use.  Id. at 5-6; 2004 IHO Tr. at 406-08.  This was confirmed by Mr. N.C. during his testimony before IHO Kandilakis.  2004 IHO Tr. at 800-03; see also Dist. Ex. 35 at 4.  Reulbach concluded that in ninth grade, M.C. "maintained high academic and behavioral standards despite his sexual abuse and family conflict," but that "after

his substance abuse escalated in his tenth grade year…his behavior both in and out of school deteriorated." Id. at 7.

The letter submitted by Schwartz on July 9, 2003 declared that M.C. "is diagnosed with major depression, single episode, severe without psychotic features" and "post traumatic stress disorder." During the July 31, 2003 CSE meeting, Reulbach, who is also trained in making clinical diagnoses, specifically disagreed with the major depression diagnosis, and expressed his belief that without his drug use, M.C would have been able to work through any post-traumatic stress through therapy. See Dist. Ex. 28 at 4; 2004 IHO Tr. at 223-24; 2004 IHO Op. at 10. Schwartz further concluded that M.C. did not have a primary drug problem, but that he had developed secondary drug abuse "in an attempt to numb or mask painful feelings." Dist. Ex. 24. Reulbach also disagreed with this conclusion. 2004 IHO Tr. at 460-61. According to the testimony of Mr. N.C., M.C. only saw Schwartz a total of three times. 2004 IHO Tr. at 827.

Gillet's letter indicates that most of M.C.'s pathology stems from the sexual abuse, and that in the period after the abuse, "his drug and alcohol use became greater and his anger and rage also became a major treatment concern at home and in school." Dist. Ex. 25 at 2-3. According to Gillet, M.C. at times felt suicidal and despondent and over time, he "began to have less and less impulse control at school" and also "became difficult at home." Id. at 3-4. Reulbach later testified before IHO Kandilakis that he did not observe M.C. to have any characteristics of suicidal behavior. 2004 IHO Tr. at 465. Gillet, who met with M.C. on a weekly basis for a period of several months, did not diagnose M.C. with depression.

After the July 31, 2003 CSE meeting, the Committee determined again that M.C. did not meet the criteria to be classified as a student with a disability, and therefore did not require special education services. See Dist. Ex. 28. Specifically, the CSE members believed that even

8

after having specifically considered M.C.'s "horrific trauma," the student did not qualify as having an "emotional disturbance" as he had not experienced any impact on his education. 2004 IHO Tr. at 230-31; Dist. Ex. 28 at 5. The CSE believed that it was M.C.'s drug use that caused his deterioration, rather than the sexual abuse. 2004 IHO Tr. at 231. On August 13, 2003, Plaintiffs informed Defendants that they did not agree with the CSE's July 31 conclusions, and requested that the hearing before IHO Kandilakis be continued. Dist. Ex. 29.

The proceedings before IHO Kandilakis continued on October 28, November 17, December 2, and December 19, 2003. Defendant submitted 34 exhibits and the testimony of two witnesses – Reulbach and Linda Schluter, Assistant Superintendent for Pupil Personnel Services. Plaintiffs submitted 14 exhibits as well as the testimony of Shein, Mr. N.C., and Renee Gotthardt, a Social Worker at Family Foundation. Much of the evidence presented to IHO Kandilakis is cited in the paragraphs above. In addition to the material previously discussed, Gotthardt testified that M.C. was evaluated by Dr. Charles Moss, the consulting psychologist at Family Foundation upon his arrival there, and it was determined that M.C. did not require regular treatment with Dr. Moss. 2004 IHO Tr. at 659-61. Moss diagnosed M.C. with substance abuse and dysthymic disorder, Dist. Ex. 35 at 6, but the staff and Family Foundation did not view M.C. as being at a crisis point. 2004 IHO Tr. at 660. Dysthymic disorder in children is characterized by an irritable or depressed mood that occurs for most of the day, more days than not, for at least one year. See Pl. Mem. at Ex. 3, p.2.

After consideration of all of the evidence, IHO Kandilakis issued an opinion on February 18, 2004 affirming the CSE's decision that M.C. did not satisfy the requirements for classification as emotionally disturbed. IHO Kandilakis concluded that M.C. had not demonstrated an inability to learn that could not be explained by intellectual, sensory, or health

9

factors, and that he had the ability to build and maintain satisfactory relationships with peers and teachers.  2004 IHO Op. at 17.  Further, IHO Kandilakis determined that M.C. did not exhibit inappropriate types of behavior or feelings under normal circumstances to the extent necessary to support a finding of emotional disturbance.  In sum, IHO Kandilakis agreed with the analysis that drug use, and not sexual abuse, was the reason for M.C.'s "downward spiral" and that a classification as emotionally disturbed was inappropriate and unnecessary.  Because IHO Kandilakis affirmed the CSE decision on this point, he did not address the issue of whether Family Foundation was an appropriate placement for M.C. – without the threshold determination that M.C. was eligible for special educational services, Plaintiffs could not be awarded tuition reimbursement for M.C.'s period of enrollment at Family Foundation.

On April 28, 2004, the SRO affirmed IHO Kandilakis's decision and dismissed Plaintiffs' appeal, concluding that the record did not establish that M.C. exhibited any of the five characteristics of emotional disturbance enumerated in New York State regulations over a long period of time to a degree that adversely impacted his educational performance.  2004 SRO Op. at 5.  The SRO found that M.C. "performed academically in a manner commensurate with his cognitive ability," and determined that his grades illustrated that his emotional condition did not have a significant effect upon his educational performance.  Further, M.C. "built and maintained a number of satisfactory relationships."  Id.  According to the SRO, M.C. did not exhibit inappropriate behavior under normal circumstances because his circumstances were decidedly not normal.  Id. at 6.  Finally, the SRO found that M.C. did not exhibit a generally pervasive mood of depression; despite the varying diagnoses in the record, the SRO observed that "the two mental health professionals most familiar with [M.C.] were [Reulbach] and [Gillet], neither of whom identified symptoms that led them to diagnose [M.C.] with depression."  Id. at 7.  Like

IHO Kandilakis, the SRO did not address the issue of tuition reimbursement, because he found that M.C. was not a student with a disability.

### ii.    2004-2005 school year

On August 12, 2004, Mr. N.C. wrote Defendant to request that M.C. be classified pursuant to the IDEA for the 2004-2005 academic year, and suggested the possibility that M.C. might return to Fox Lane for that school year.  Dist. Ex. 1.[7]  In September, Mr. N.C. met with Steve Marcisz, Coordinator of Guidance at Fox Lane, to discuss a potential academic program that would allow M.C. to graduate on time if he returned to Fox Lane.  See Dist. Ex. 5.  Plaintiffs ultimately decided to continue M.C.'s enrollment at Family Foundation, and when Defendant declined to reimburse Plaintiffs for the expense of sending M.C. to Family Foundation for the 2004-2005 year, they demanded an impartial hearing on the issue of M.C.'s eligibility for special educational services.  See Dist. Exs. 6, 7.

The CSE met on January 11, 2005; the principal new information considered at this CSE session was a telephonic update on M.C.'s progress from Gotthardt, who reported that M.C. "made very good headway at the school" – his grades were in the low 80s and he was involved in extra-curricular activities.  Dist. Ex. 8 at 1.  According to Gotthardt, M.C.'s relationships with peers and authority figures were strong, and he had not demonstrated any acting out or inappropriate behaviors.  Id.  After reviewing the criteria for eligibility, the CSE determined that M.C. still could not be classified as a student with a disability for the purposes of the IDEA.  Dr. Ivan Fras submitted a letter the following day indicating that M.C.'s "dysthymic condition continues" and that M.C. "continues to suffer from bouts of depression but has learned skills to

---

[7] References to "Dist. Ex." and "Par. Ex." in this sub-section are to the exhibit numbers in the August 18, 2005 proceeding before IHO Luban.

address it"; M.C. stopped taking the anti-depressant Zoloft in May 2004, and also stopped meeting with Fras at that time.  Dist. Ex. 9; 2005 IHO Tr. at 118.

The parties took part in a series of pre-hearing discussions with IHO Luban to discuss, among other items, the scope of the issues that IHO Luban could review, given the previous findings of the SRO and IHO Kandilakis in the 2003-2004 proceedings.  Specifically, the parties briefed the issue of whether IHO Luban was precluded from hearing evidence concerning whether M.C. could be classified as emotionally disturbed.  IHO Luban issued an interim decision on March 18, 2005 in which he ruled that he would hold a hearing to address M.C.'s needs for the 2004-2005 academic year only.  See IHO Luban Interim Op. at 8.  All issues that "were or could have been raised in the hearing and appeal for the 2003-2004 school year" were dismissed.  Id. at 9.

A short hearing was held before IHO Luban on August 18, 2005.  Defendants submitted 15 exhibits and the testimony of Schluter; Plaintiffs submitted four exhibits[8] and the testimony of M.C. and Father Steven Morris, the Chaplain at Family Foundation.  Morris, who does not have any formal mental health training, testified that M.C made substantial progress in his time at Family Foundation from being a "nasty," "moody," and "difficult" young man when he arrived at the school to one who he described as "happy," "responsible," and "kind" when he left.  2005 IHO Tr. at 81.  M.C. also testified to the progress he made at Family Foundation – according to his testimony, he left the school with "a sense of self-worth and a sense of value, dignity, responsibility, determination, love for others, sobriety, [and] hope."  2005 IHO Tr. at 111.  Most of M.C.'s grades at Family Foundation were in the 80s, though he had some in the 60s, 70s, and

---

[8] Plaintiffs' exhibit D consisted of nine documents, all of which were part of the record before IHO Kandilakis.

90s.  Dist. Ex. 10; 2005 IHO Tr. at 119-20.  He graduated with a Regents diploma in June 2005

and planned to start college in August of that year.  2005 IHO Tr. at 103, 120.

On November 3, 2005, IHO Luban issued a decision and order upholding the findings of

the CSE – IHO Luban agreed that M.C. was not emotionally disturbed within the meaning of the

IDEA, and therefore was not eligible for special educational services.  Absent a determination

that M.C. was a child with a disability, Plaintiffs were not entitled to receive reimbursement from

Defendant for M.C.'s tuition at Family Foundation.  IHO Luban did criticize the CSE's response

to the request for classification for the 2004-2005 academic year, 2005 IHO Op. at 10, but the

CSE's poor handling of the August 2004 request did not change the fact that M.C. did not meet

the requirements for classification as emotionally disturbed.

Plaintiffs appealed the decision of IHO Luban to the SRO.  On February 23, 2006, the

SRO affirmed IHO Luban's ruling that M.C. was not a child with a disability under the IDEA

because he did not meet the criteria for emotional disturbance.  The SRO rejected Plaintiffs'

claim that M.C. exhibited a generally pervasive mood of unhappiness or depression over a long

period of time, as required by the regulations; he also concluded that the evidence presented

belied any argument that M.C.'s condition adversely affected his educational performance.  2005

SRO Op. at 8-9.

## II.    Discussion

### A.    Standard of review – both years

Though the parties here did not frame their respective arguments as motions for summary

judgment, IDEA actions in federal court generally are resolved by examination of the

administrative record in a summary judgment procedural posture.  See Viola v. Arlington Cent.

Sch. Dist., 414 F. Supp. 2d 366, 378 (S.D.N.Y. 2006).  Unlike an ordinary summary judgment

motion, however, the existence of a disputed issue of material fact will not defeat the motion. See Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Instead, federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence, taking into account the record from the administrative proceedings and any additional evidence presented by the parties. See 20 U.S.C. § 1415(i)(2)(C).  The party seeking relief has the burden of proof when challenging an administrative decision.  See Schaffer, 126 S. Ct. at 531.  This Court will analyze the motions for both years under the modified summary judgment posture frequently used by federal courts for reviewing IDEA matters.

A court deciding a summary judgment motion in an IDEA case must examine the administrative record and any additional evidence to determine if "there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."  Antonaccio, 281 F. Supp. 2d at 714.  In general, however, the Supreme Court and the Second Circuit have strictly limited judicial review of state administrative decisions in IDEA cases.  See, e.g., D.F. v. Ramapo Central Sch. Dist., 430 F.3d 595, 598 (2d. Cir. 2005) (citing Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 204 (1982)).  While "federal courts do not simply rubber stamp administrative decisions," Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998), courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206.  Instead, federal courts reviewing administrative decisions must give "due weight" to the administrative proceedings, "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206, 208).  District courts

therefore give "substantial deference" to final administrative judgments implicating educational policies and practices.  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).

The issues presented in this matter, however, are different from those typically raised in IDEA cases.  Here, Plaintiffs are challenging the school district's threshold classification of whether M.C. was an individual with a disability.  Whereas many IDEA decisions address the question of whether a student's Individualized Education Plan ("IEP") was satisfactory, see, e.g., D.F. v. Ramapo Cent. Sch. Dist., 348 F. Supp. 2d 92 (S.D.N.Y. 2004), M.C. was not provided with an IEP because the CSE determined that he was not disabled within the meaning of the IDEA.  Thus, the central issue in dispute here is whether M.C. met the criteria for being emotionally disturbed.  The Second Circuit has held that "resolution of this issue involves interpretation of the IDEA and the definition of 'emotional disturbance' under the applicable federal and New York State regulations.  In this matter of statutory interpretation, the district court [is] as well-positioned as the state administrative officials to determine [a student's] eligibility."  Muller v. Comm. on Special Educ. of the E. Islip Union Free Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998).  A district court is not required to give state administrative proceedings the usual "due weight" when the administrative decision concerns an issue of law.  Id. (citing Mrs. B v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997)).  Accordingly, for both years, this Court is required to consider de novo the issue of whether M.C. met the statutory requirements for a disability.  See id.

**B.      Legal standards – both years**

A child with a disability for the purposes of the IDEA is a student who has been evaluated and been determined to have one or more of 12 specified conditions and who, by reason of that condition, needs special education and related services.  See 34 C.F.R. §

300.8(a)(1).  A student with an "emotional disturbance" qualifies as a child with a disability for the purposes of the IDEA.  Id.  Under to New York State Department of Education regulations, an "emotional disturbance" is

> "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a student's educational performance:
>
> > (i)     an inability to learn that cannot be explained by intellectual, sensory, or health factors;
> >
> > (ii)    an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
> >
> > (iii)   inappropriate types of behavior or feelings under normal circumstances;
> >
> > (iv)    a generally pervasive mood of unhappiness or depression; or
> >
> > (v)     a tendency to develop physical symptoms or fears associated with personal or school problems.
>
> The term includes schizophrenia.  The term does not apply to students who are socially maladjusted, unless it is determined that they have an emotional disturbance."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4); see 34 C.F.R. § 300.8(c)(4).

In Muller, the CSE, IHO, and SRO all determined that it was not appropriate to classify the plaintiffs' daughter, Treena Muller, as having a serious emotional disturbance.  See Muller, 145 F.3d at 103.  Upon its review of the factors listed above, the district court reversed the administrative findings, and the Second Circuit affirmed the district court's conclusion that the plaintiff's daughter was in fact emotionally disturbed.  Id.  The Muller plaintiffs were able to demonstrate that Treena Muller had an inability to learn, and also that she exhibited two of the four other enumerated characteristics over a long period of time and to a marked degree such that her condition adversely affected her educational performance.

C.      M.C.'s entitlement to educational services under the IDEA – 2003-2004

As detailed above, the CSE, IHO Kandilakis, and the SRO all concluded that M.C. did

not have an emotional disturbance for the purposes of the IDEA during 2003-2004.  After

reviewing the administrative record *de novo* and considering the language of the New York

regulation, this Court agrees with the administrative determinations and concludes that M.C. was

not emotionally disturbed for the purposes of the IDEA.

i.      An inability to learn that cannot be explained by intellectual, sensory,
        or health factors

Based on the information in the administrative record, it is not clear that M.C. suffered

from an inability to learn over a long period of time or to a marked degree, despite the highly

traumatic experiences he suffered.  In Muller, Treena Muller showed significant signs of

academic shortcomings – she was required to repeat first grade, received remedial reading

services, and failed multiple subjects in the seventh and eighth grades.  Tellingly, her educational

performance improved in alternative settings that addressed her emotional problems.  See

Muller, 145 F.3d at 103-04.  Another district court in this Circuit found a downward decline in

academic performance from a year-end average of 85 to a year end average of 66.74 to be

substantial enough to meet the threshold for this factor.  See New Paltz Cent. Sch. Dist. v. St.

Pierre, 307 F. Supp. 2d 394, 399 (N.D.N.Y. 2004).

M.C.'s academic problems were never so severe as to qualify as an "inability to learn."

In ninth grade – the time period during which the sexual abuse escalated to its most serious

levels – M.C. maintained an overall average of 84.17, and was on the Fox Lane honor roll for

three quarters of the year.  Even though M.C. suffered some drop-off in performance during

tenth grade, the decline was not as precipitous as in St. Pierre.  Though he struggled during the

first two marking periods of the year – struggles that could be attributed to, among other things,

his escalating drug use – M.C.'s grades recovered by the third marking period to a level similar

to his ninth grade achievement.  His overall average for the first three quarters was 73.8, but with

a third quarter average of 79.5, M.C.'s grades were showing improvement.  Further, M.C.'s

grades at Family Foundation were generally similar to those he earned at Fox Lane – there was

no evidence presented of dramatic academic improvement in the new environment.  See Par. Ex.

H.  Accordingly, M.C. did not suffer from an inability to learn that cannot be explained by

intellectual, sensory, or health factors.

> ii.     **An inability to build or maintain satisfactory interpersonal relationships with peers and teachers**

The evidence presented strongly suggests that M.C. did not have difficulty building or

maintaining satisfactory interpersonal relationships, and Plaintiffs make no such argument in

their memorandum of law.  Reulbach wrote in his revised social history that M.C. was "well

liked by both students and teachers and recognized by all as a leader," and later testified that he

"was liked by all his teachers" and had a "huge friendship group" for the majority of time he

attended Fox Lane.  2004 IHO Tr. at 415.  There was evidence to suggest that M.C.'s

interpersonal relationships began to erode in his final months at the public school – he stopped

seeing Reulbach regularly, and developed a different social circle – but none of this took place

over a long period of time or to a marked degree, especially when contrasted with his long

history of positive interactions with peers and staff.

> iii.    **Inappropriate types of behavior or feelings under normal circumstances**

Though M.C.'s behavior was, at times, inappropriate, the conduct described in the

evidentiary record, without more, is not enough to qualify him for classification as emotionally

disturbed.  In finding that Treena Muller exhibited inappropriate behavior under normal

circumstances, the Second Circuit referred to suicide attempts, arson attempts, lies, cutting

classes, failure to complete homework, stealing things, quitting the basketball team, defiance, poor grades and academic performance as examples of inappropriate behavior.  Muller, 145 F.3d at 104.  The Court was careful to note, however, that "many of these behaviors, of course, are not unusual or 'inappropriate' by themselves"  Id.  It was only in combination that these actions met the requirements for this factor of emotional disturbance.  Id.  Both state and federal regulations make clear that a student is not to be classified as emotionally disturbed merely because of bad behavior that is not connected to an emotional disturbance – the regulations explicitly do not apply to students who are simply "socially maladjusted."  See, e.g., Springer by Springer v. Fairfax County School Board, 134 F.3d 659, 664-65 (4th Cir. 1998).  In Springer, the student's inappropriate behavior was attributed to a conduct disorder, without an accompanying independent emotional disturbance, an analysis which was the "overwhelming consensus" among the psychologists who examined the student.  Id. at 665-66.

The SRO concluded M.C.'s behavior and feelings were not "inappropriate under normal circumstances" because the traumatic events in M.C.'s life made his "circumstances" anything but normal.  See 2004 SRO Op. at 6.  In short, the SRO seemed to suggest that because he had been through a terrible ordeal, M.C. could be expected to act out, and therefore his behavior was not inappropriate for the purposes of the IDEA.  We cannot agree with the SRO's approach to this question – the baseline for measuring the appropriateness of a child's behavior must be some conception of "normal" circumstances.  If we discount this factor for children who have suffered severe trauma because we expect that such individuals will behave in inappropriate ways, we effectively discount the impact of the experience that may have led to the alleged emotional disturbance in the first place.  To assess whether M.C. was behaving or feeling inappropriately under normal circumstances, we must consider what would be appropriate behavior for a child

who had never experienced any of the horrors experienced by M.C., and determine whether M.C.'s behavior is appropriate in relation to that child's conduct.

Using this approach, it is clear that M.C.'s behavior during his tenth grade school year was, to an extent, inappropriate.  There is evidence in the record that M.C. was using marijuana regularly and experimenting with other narcotics, and he was suspended from school three times in less than three months for fighting with other students and for drug possession.  M.C.'s heightened aggression and worsening substance abuse problem do not represent behavior that can be considered appropriate under normal circumstances.  That said, however, M.C.'s drug use and aggressive behavior, without more, are not enough to qualify him for classification as emotionally disturbed – his conduct during tenth grade can be viewed as the type of bad behavior that characterizes social maladjustment, which, by itself, is not covered under the IDEA.  While there is certainly more doubt in the record here about M.C.'s accompanying psychological condition than there was in <u>Springer</u>, the two professionals who interacted with M.C. most often – Reulbach and Gillet – did not view M.C. as depressed.  Reulbach, for one, cited M.C.'s drug use as the root cause of his problems, a conclusion more consistent with social maladjustment than with emotional disturbance.  Indeed, the strongest evidence in favor of M.C.'s depression was submitted by Schwartz, who only met with M.C. on three occasions.  Moss, who only appears to have met with M.C. once, diagnosed him with substance abuse and dysthymic disorder, but did not treat M.C. for depression during the time he was at Family Foundation.  Thus, while there are certain indications of inappropriate behavior, there is insufficient proof of an accompanying emotional disturbance beyond the bad conduct to merit a finding of emotional disturbance.  Absent a showing that M.C. satisfied any of the other criteria for emotional

disturbance, it is impossible to find that this factor alone is enough to warrant the classification that Plaintiffs seek.

### iv.    Generally pervasive mood of unhappiness or depression

This Court agrees with the SRO that the record here does not persuasively demonstrate that M.C. exhibited a generally pervasive mood of unhappiness or depression for a long period of time and to a marked degree.  In Muller, the plaintiffs' daughter met the conditions for this factor – she showed unhappiness, depression and despondency, which included a suicide attempt, and numerous doctors specifically noted symptoms of depression and treatment for depression. Muller, 145 F.3d at 104.  The Second Circuit made clear, however, that "the regulation does not require that the student be clinically or medically depressed."  Id.

As discussed above, there was some disagreement among the various professionals who treated M.C. about the extent of his psychological problems, and the role that his drug use played in his state of mind.  Gillet indicated that M.C.'s pathology stemmed from the sexual abuse, and that he was suicidal and despondent at times – though he did not say when and for how long, and the record does not provide any greater detail about any suicidal ideation.  Ultimately, Gillet made diagnoses of substance abuse and post-traumatic stress disorder.  Schwartz, who only met with M.C. three times, offered the most serious diagnosis of major depression, single episode; he also diagnosed post traumatic stress disorder.  Moss diagnosed M.C. with substance abuse and dysthymic disorder after only one session with him, but then did not treat M.C. for the symptoms of depression or irritability that are characteristic of such a disorder.  In his one-time evaluation of M.C., Shein did not observe M.C. to be depressed or irritable – he described M.C.'s demeanor and attitude as appropriate.  Reulbach, who had the longest relationship with M.C., but whose relationship was more limited during M.C.'s tenth grade year, strongly disagreed with the major

depression diagnosis, testified that the did not observe in M.C. any characteristics of suicidal behavior, and attributed M.C.'s tenth grade struggles to his escalating drug use.

Reulbach's detailed observations of M.C. over a substantial period of time, combined with his testimony before IHO Kandilakis and his extensive credentials, make for a particularly credible assessment of M.C.'s psychological makeup.  In attempting to balance the various conflicting reports and observations presented by the various mental health professionals who met with M.C., this Court found Reulbach's depiction to be the most thorough, the best developed, and the most accurate.  On certain days, M.C. clearly presented symptoms of more serious psychological issues – this explains the diagnoses of Schwartz and Moss, who had limited contact with M.C.  Similarly, on other days, M.C. presented virtually none of those symptoms – this explains the conclusions reached by Shein.  On balance, this Court concludes that while M.C. may, at times, have suffered more difficult psychological episodes than the average teenage boy, his condition does not rise to the level of a generally pervasive mood of unhappiness or depression for a long period of time or to a marked degree.  Further, whatever psychological difficulties M.C. did experience did not appear to have adversely affected M.C.'s educational performance, as required by the regulations.  There is, of course, no denying that M.C. experienced a terrible trauma that had a substantial impact on his childhood, but that does not automatically equate to a finding that he experienced a generally pervasive mood of unhappiness or depression for a long period of time.

> **v.     A tendency to develop physical symptoms or fears associated with personal or school problems**

As noted in IHO Kandilakis's opinion, there was no allegation during the administrative proceedings that M.C. suffered from a tendency to develop physical symptoms or fears associated with personal or school problems.  See 2004 IHO Op. at 18.  Plaintiffs did not raise

this issue on this appeal, and there is no evidence in the record to support a conclusion that M.C. had this problem.

Accordingly, this Court concludes that M.C. did not suffer four of the five enumerated factors over a long period of time and to a marked degree; as to the fifth factor, to the extent that M.C. demonstrated inappropriate behavior under normal circumstances, this behavior is better described as social maladjustment, which is not covered by the IDEA.  Furthermore, even if one were to conclude that M.C. had experienced one or more of these factors, there is not enough evidence in the record to show that M.C.'s educational performance was adversely affected, as required by state and federal regulations.  Thus, the decision of the CSE, IHO Kandilakis, and the SRO not to classify M.C. as emotionally disturbed under the IDEA is hereby affirmed.


**D.       Tuition reimbursement for unilateral placement – 2003-2004**

Where, as here, Plaintiffs seek reimbursement for the unilateral placement of a child into a private special education program, a school district may be required to pay for the educational services if: (1) the services offered by the school district were inadequate or inappropriate; and (2) the private placement selected by the parents was appropriate.  See Sch. Comm. of the Town of Burlington, Mass. v. Dep't. of Educ., 471 U.S. 359, 370 (1985); M.S v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 102 (2d. Cir. 2000).

Because this Court has determined that the decision of Defendant's CSE not to classify M.C. as emotionally disturbed in 2004 was appropriate, Defendant was under no obligation to offer special educational services to M.C. under the IDEA.  Accordingly, Plaintiffs cannot show that Defendant failed to meet the first Burlington requirement, and Plaintiffs' request for tuition reimbursement for 2003-2004 is denied.  There is no need to analyze whether Plaintiffs' placement of M.C. at Family Foundation was appropriate.

**E.      M.C.'s entitlement to educational services under the IDEA – 2004-2005**

      **i.      Procedural issues**

In its Answer to Plaintiffs' Supplemental Complaint, Defendant claims that this Court lacks subject matter jurisdiction to address Plaintiff's appeal of the 2005 SRO decision as part of the action that first was filed to address the 2004 SRO decision.  Defendant offers no support for this statement in it's memorandum of law.  In the interest of judicial economy, this Court determined that it made most sense to allow Plaintiff to file a supplemental complaint to the original lawsuit, which involves the exact same parties litigating virtually the exact same legal issues.  Though Plaintiffs could have filed a separate complaint under a separate docket number, it would be unfair and illogical to penalize them for following a procedure to which this Court specifically consented.  There is no substantive or procedural merit to Defendant's subject matter jurisdiction defense, and it is hereby dismissed.

Defendant further argues that Plaintiffs' 2004-2005 appeal is time barred because the Complaint was not served or filed until well after the deadline for seeking federal district court review of the SRO decision.  Assuming, without deciding, that Defendant's analysis is correct and that Plaintiff had four months from the date of the SRO decision – February 23, 2006 – to file a timely appeal, Plaintiff's actions still are timely in the eyes of this Court.  Pursuant to this Court's Individualized Practice Rules, litigants are required to request a pre-motion conference before filing motions.  There is no question that Plaintiff requested a pre-motion conference within the purported four-month window for filing her appeal; as far as this Court is concerned, making her request within this cutoff period satisfied her obligation to act in a timely manner.  Again, Plaintiffs could have acted differently to ensure timeliness – for example, they could have filed a separate civil action within the four-month window – but this Court refuses to invalidate

Plaintiffs' appeal simply because their counsel complied with this Court's rules.  Defendant's second defense is also hereby dismissed.

### ii.    Statutory / regulatory factors

As detailed above, the CSE, IHO Luban, and the SRO all concluded that M.C. did not have an emotional disturbance for the purposes of the IDEA for the 2004-2005 academic year. After reviewing the administrative record *de novo* and considering the language of the New York regulation, this Court agrees with the administrative determinations and concludes that M.C. was not emotionally disturbed for the purposes of the IDEA.

### 1.    An inability to learn that cannot be explained by intellectual, sensory, or health factors

There was no evidence that M.C. suffered an inability to learn either at the outset of, or at any point during the 2004-2005 academic year.  Gotthardt told the CSE that M.C. maintained grades in the 80s, and this was confirmed by M.C.'s own testimony and report cards.  M.C.'s level of academic achievement at Family Foundation was comparable to his record at Fox Lane; thus, he did not demonstrate that his emotional state was preventing him from learning.

### 2.    An inability to build or maintain satisfactory interpersonal relationships with peers and teachers

At the outset of and during the 2004-2005 academic year, the evidence showed that M.C. was able to maintain strong interpersonal relationships with peers and teachers at Family Foundation.  Gotthardt told the CSE that M.C. had taken on the responsibility of serving as a mentor to other students, and that he was respectful and trusting of adults at the school.  It was also clear from Morris's testimony that M.C. had developed a relationship with him, and Morris's description of M.C. indicated the stability of his interpersonal relationships.

### 3. Inappropriate types of behavior or feelings under normal circumstances

There is no evidence that M.C. was engaged in inappropriate behavior, or was plagued by inappropriate feelings over a long period of time or to a marked degree for the 2004-2005 academic year.  Whatever behavioral problems M.C. had been experiencing during his final months at Fox Lane were not nearly as great a distraction leading up to and during the 2004-2005 year.  Gotthardt reported that M.C.'s only acting out behavior was of a minor level, and Morris's very positive testimony regarding M.C.'s transformation did not provide any indication of inappropriate behavior or feelings.

### 4. A generally pervasive mood of unhappiness or depression

Nothing presented as part of the 2004-2005 proceedings substantiate the claim that M.C. suffered from a generally pervasive mood of unhappiness or depression.  Gotthardt told the CSE that M.C. had made substantial progress in learning how to deal with his depression, and was suffering fewer symptoms than he had been the previous year.  The only significant new evidence supporting Plaintiffs' arguments regarding M.C.'s psychological condition was the letter from Fras, and this Court agrees with the SRO's analysis of that document.  Fras's letter states, without providing any detail or context, that M.C.'s dysthymic condition continues and that he suffers from bouts of depression.  The diagnosis alone – even when combined with Plaintiffs' repeated citations to the Diagnostic and Statistical Manual – is not sufficient for a determination that M.C. meets this threshold.  Plaintiffs offer no documentary or testimonial support to demonstrate how often M.C. suffers these bouts of depression, and Fras's letter indicates that M.C. has made progress, has learned skills to address his condition, and stopped taking Zoloft in May 2004.  In addition, M.C.'s academic progress belies the notion that his psychological condition adversely affected his educational performance, as required by state and

federal regulations.  In short, Plaintiffs have not shown that M.C. should qualify for a

classification as emotionally disturbed based on this factor.

### 5.   A tendency to develop physical symptoms or fears associated with personal or school problems.

As in the 2003-2004 proceedings, Plaintiffs never argued that this factor applied to M.C.,

and did not attempt to present any evidence in this regard.

Accordingly, this Court concludes that for the 2004-2005 academic year, M.C. did not

suffer any of the five enumerated factors over a long period of time and to a marked degree.

Furthermore, even if one were to conclude that M.C. had experienced one or more of these

factors, there is not enough evidence in the record to show that M.C.'s educational performance

was adversely affected, as required by state and federal regulations.  Thus, the decision of the

CSE, IHO Luban, and the SRO not to classify M.C. as emotionally disturbed within the meaning

of the IDEA is hereby affirmed.

### iii.   CSE procedures

Plaintiffs devote significant space in their 2006 Memorandum of Law to the procedural

flaws of the CSE process.  While this Court agrees with the IHO and the SRO that Defendant's

CSE did not comply precisely with state and federal regulations in terms of information

gathering and in its statement of reasons for ineligibility, this Court also agrees that these errors

are not significant enough to warrant a reversal of the CSE's findings.

The CSE took the position that new evaluations of M.C. were not necessary based on

Plaintiffs' August 2004 request for classification, because those evaluations had been conducted

in advance of the 2003 CSE meetings just over one year earlier.  When Gotthardt's presentation

at the January 11, 2005 CSE meeting indicated that M.C. had made substantial progress since

arriving at Family Foundation, it only confirmed Defendant's initial impression that further

evaluation of M.C. was unnecessary.  Of course, this *post hoc* logic does not excuse Defendant's

lack of response to Plaintiff's August 2004 classification request.  It does, however, convince

this Court that the lack of additional evaluations amounted to harmless error.  The CSE's

decision not to reconvene to consider Fras's January 12 letter is also harmless, as this Court has

had the opportunity to review that letter as part of the *de novo* review for this analysis.  As

detailed above, there was not nearly enough evidence presented in the 2004-2005 proceedings to

warrant a conclusion that M.C. was emotionally disturbed for the 2004-2005 year, and there is no

reason to believe that additional evaluations would have shown otherwise.


   **F.**  **Tuition reimbursement for unilateral placement – 2004-2005**

  The legal standard for tuition reimbursement set forth in Section C, <u>supra</u>, also applies to

Plaintiffs' request reimbursement for the 2004-2005 school year.

  Because this Court has determined that the decision of Defendant's CSE not to classify

M.C. as emotionally disturbed in 2005 was appropriate, Defendant was under no obligation to

offer special educational services to M.C. under the IDEA.  Accordingly, Plaintiffs cannot show

that Defendant failed to meet the first <u>Burlington</u> requirement, and Plaintiffs' request for tuition

reimbursement for 2004-2005 is denied.  Again, there is no need to analyze whether Plaintiffs'

placement of M.C. at Family Foundation was appropriate.

## III.    Conclusion

For the reasons discussed above, judgment is entered for the Defendant. Defendant's

motions are GRANTED in their entirety, and Plaintiffs' motions are DENIED in their entirety.

The Clerk of the Court is hereby directed to close this case.

IT IS SO ORDERED.

Dated:  February 7, 2007

White Plains, New York

Stephen C. Robinson
United States District Judge

29